## UNITED STATES BANKRUPTCY COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

In Re:                                    )

FM AVIATION II, LLC,                      )          Case No: 3:10-bk-24832-CED

        Debtor.                          )          Chapter 11

_____ )

## MOTION TO DISMISS[1]

    VFS Financing, Inc. ("VFS") pursuant to 11 U.S.C. §§ 305, 1104 and 1112 and Rule 1017, Federal Rules of Bankruptcy Procedure, moves to dismiss the above-captioned bankruptcy case filed by FM Aviation II, LLC (the "Debtor") on October 14, 2010 (the "Petition Date").  In support of this motion, VFS states as follows:

## INTRODUCTION

    This case has no place in bankruptcy.  The Debtor is, by its own account, a two-asset entity with no unencumbered property.  It has *no* income, *no* employees, and *no* operating business to reorganize.  Indeed, the Debtor *never* operated any aircraft chartering business prior to the Petition Date, was and remains prohibited from operating such a business under the express terms of the Loan Agreements at issues, and is unqualified to do so now.  The sole purpose of filing this case was to delay VFS's ability to obtain possession of the two aircraft that secure VFS's

---

[1] The Court has already scheduled a hearing on VFS's Motion to Lift the Stay (ECF No. 18) for November 23, 2010.  Because the issues raised in the Motion to Lift the Stay and this Motion to Dismiss are substantially the same, if not identical, in the interests of judicial economy, VFS requests that the Court set this Motion to Dismiss for hearing on November 23 as well.

loans to the Debtor and to forestall VFS's efforts to exercise its contractual and court-determined rights against the Debtor – a holding company for the two aircraft – and its sole owner, Frank Mongelluzzi.

The protection and privileges of the Bankruptcy Code are now, and have always been, for the honest debtor. The Bankruptcy Code should not be used by a non-operating business for the *sole* purpose of delaying and/or hindering a senior secured creditor from exercising its rights against collateral. For these reasons, VFS requests that this case be dismissed, with the respective rights, remedies and priorities between the only two parties involved to be resolved in state court.

## FACTUAL BACKGROUND

1.     On November 23, 2009, the Debtor and VFS entered into two separate Aircraft Security Agreements (the "Security Agreements").

2.     On November 23, 2009, the Debtor also executed two Promissory Notes (the "Promissory Notes"; and together with the Security Agreements, the "Loan Documents"), pursuant to which VFS extended financing to the Debtor in the principal amounts of Eight Million Two Hundred Thousand dollars $8,200,000.00 and $9,300,000.00, for a total amount of $17,500,000.00.

3.     Pursuant to the Loan Documents, VFS financed the Debtor's purchase of: (1) that certain Gulfstream Aerospace (Model G-IV, Serial No. 1104, Registration No. N2SA; and Engine Make: Rolls Royce, Model Tay-611-8, Serial Nos. 16136 & 16145) (the "N2SA"), and (2) that certain Gulfstream Aerospace

(Model G-IV, Serial No. 1171, Registration No. N3SA; and Engine Make: Rolls Royce, Model Tay-MK611-8, Serial Nos. 16396 & 16270) (the "N3SA"; collectively at times with N2SA, the "Aircraft").

4.     In exchange, VFS was granted a first priority security interest in, *inter alia*, the Aircraft as well as all proceeds related thereto.

5.     The Loan Documents require the Debtor to make one hundred and twenty (120) consecutive monthly installment payments to VFS, beginning on January 1, 2010, with each successive Monthly Payment due on the same day of each succeeding month.   Excluding the first three months of payments and the balloon payment upon maturity, the Monthly Payments due and owing under the Promissory Notes are equal to $157,376.43 per month.  The failure to make any Monthly Payment when due constitutes an Event of Default under the Loan Documents.

6.     The Loan Documents prohibit any leasing, chartering, sale of any interest or any other sharing agreement related to the Aircraft without the prior written consent of VFS.  Specifically, the Security Agreements provide that the:

> Debtor shall not, and shall not attempt to, sell all or any fractional interest in, assign, mortgage, grant a Lien in, transfer or encumber or dispose of the Aircraft, or any interest…therein, or any part thereof, without the prior written consent of [VFS].  **Debtor shall not, and shall not attempt to, lease, charter, enter into any pooling or interchange agreements, rent, or grant any time-shares**

> with respect to or otherwise deliver possession of … the
> Aircraft, without [VFS]'s prior written consent…."

*Security Agreements*, § 5(a).

7.     Indeed, any attempt by the Debtor to sell, lease, charter, rent, etc. the Aircraft constitutes an event of default under the Security Agreements, and is cause for repossession of the Aircraft.

8.     Upon default under the Loan Documents, VFS is entitled to declare the unpaid balance of the Promissory Notes to be immediately due and payable. Additionally, upon default, VFS has the express right to:  (1) "take immediate and exclusive possession of the Aircraft, wherever [they] may be found;" and (2) direct Debtor to "assemble all parts and components of the Aircraft and deliver [them] to [VFS], at Debtor's expense, at a place designated by [VFS] which is reasonably convenient to [VFS]."  *Security Agreements*, § 9(b).

9.     As additional security for the Debtor's obligations under the Loan Documents, Frank Mongelluzzi and Anne Mongelluzzi (collectively, the "Individual Guarantors") each executed a Joint Guaranty in favor of VFS agreeing to "primary, absolute, continuing and unconditional" liability for the Debtor's obligations to VFS under the Loan Documents ("Guaranty").

10.     In addition, Able Body Temporary Services, Inc., an entity wholly owned and controlled by Frank and Anne Mongelluzzi (the "Corporate Guarantor"; collectively with the Individual Guarantors, the "Guarantors") executed a Corporate Guaranty in favor of VFS agreeing to "primary, absolute,

continuing and unconditional" liability for the Debtor's obligations to VFS under the Loan Documents ("Corporate Guaranty").

11.    The Debtor has defaulted on its obligations under the Loan Documents by, *inter alia*, failing to make the required Monthly Payments.

12.    On August 5, 2010, a formal Notice of Default was sent to the Debtor and the Guarantors demanding payment of all past due amounts (the "Default Letter").  Neither the Debtor nor the Guarantors responded to the Default Letter, and both the Debtor and the Guarantors failed to make payments as required under the Loan Documents, Individual Guaranty and Corporate Guaranty.

13.    On August 20, 2010, the Debtor and the Guarantors were sent notice that the obligations under the Loan Documents had been accelerated and immediate payment of all obligations of the Debtor was demanded in full. Nevertheless, the Debtor and the Guarantors ignored their obligations to VFS, and no payments were made.

14.    Further, notwithstanding VFS' repeated requests, the Debtor refused to return the Aircraft and, indeed, refused to even tell VFS where the Aircraft were located.

15.    In fact, the Debtor blocked VFS's ability to monitor the flights of the Aircraft on Flighttracker.com.

## THE PRIOR ORDERED INJUNCTIVE RELIEF

16.     As a result of the Debtor's numerous defaults, VFS filed a Complaint in the Supreme Court of New York (the "New York State Court").

17.     Additionally, because the Debtor was refusing to disclose the location of the Aircraft, VFS was required to seek a Temporary Restraining Order, which was entered on September 7, 2010, by the Honorable Barbara R. Kapnick of the New York Supreme Court issued (the "TRO").  The TRO required, among other things, that: (i) the Aircraft be immediately grounded, (ii) the location of the Aircraft be immediately disclosed to VFS; and (iii) VFS be granted immediate access to the Aircraft.

18.     The TRO also ordered the Debtor and the Guarantors (Able Body Temporary Services, Inc., Frank Mongelluzzi and Anne Mongelluzzi) to show cause on September 28, 2010 why an order should not be entered (a) granting an order of seizure, and (b) granting a preliminary injunction seizing the Aircraft.

19.     Finally, the TRO provided that, pending a Hearing, the Debtor and any of its agents or employees and anyone who had knowledge of the TRO, were (a) enjoined and restrained from using the Aircraft; (b) ordered to immediately disclose the precise location of the Aircraft to VFS or to agents designated by VFS in order to reclaim the same; and (c) enjoined from restricting the access of VFS to the Aircraft.

## FM AVIATION'S FIRST BREACHES OF THE TRO

20.    The Debtor failed to comply with the TRO.

21.    Despite repeated emails and telephone calls to Debtor's counsel demanding compliance with the TRO and disclosure of the location of the Aircraft, it was not until September 10, 2010, that Debtor's then counsel, David Lamont, finally provided the location of the Aircraft.

22.    On September 10, 2010, Mr. Lamont disclosed that N2SA was located in Dallas, Texas, and that the N3SA was located in Ontario, California.

23.    Following the issuance of the TRO, VFS became aware that the Debtor was not only disregarding the TRO, but was also trying to "trade" the Aircraft without the consent of VFS. *See also, Chapter 11 Case Management Summary* [Docket No. 22], ¶ 3 ("Debtor contiued [*sic*] efforts to sell the aircraft, but also explored…efforts to exchange the aircraft…."). As indicated above, this attempt to sell or "trade" the Aircraft without the cooperation of VFS constitutes an independent event of default under the terms of the Security Agreements. *Security Agreements,* § 8(c)  (an Event of Default occurs if "Debtor sells all or any fractional interest in, rents, leases, charters, mortgages, assigns…or otherwise delivers possession of, transfers, or encumbers the Aircraft…*or attempts to do any of the foregoing*….") (emphasis added).

## GUARANTOR ABLE BODY'S TRANSFER
## OF SUBSTANTIALLY ALL ITS ASSETS

24. Following the entry of the TRO, VFS learned that the Corporate Guarantor – also a defendant in the New York action – purported to sell or otherwise transfer its assets to an entity named MDT Personnel (the "MDT Transaction"). VFS learned of this as a result of a news article.

25. The Corporate Guarantor is owned and controlled by Frank Mongelluzzi and Anne Mongelluzzi.

26. Through independent investigation, and as confirmed by the Corporate Guarantor's and the Mongelluzzi's counsel, Mr. Lamont, MDT Personnel was created solely for the purpose of accepting transfer of the Corporate Guarantor's assets and was created by the Mongelluzzi's long-time friend, Michael D. Traina.

27. VFS immediately demanded information regarding the purported sale or transfer of the Corporate Guarantor's assets and the consideration paid or still due therefore.

28. Despite continued promises by Mr. Lamont that he would provide information related to the purported sale of the Corporate Guarantor's assets and make arrangements to secure those assets for the benefit of VFS, no information was provided to VFS.

## THE PRELIMINARY INJUNCTION

29.     On September 28, 2010, Judge Kapnick issued a preliminary injunction in the New York action which: (i) prohibited the Debtor from using of the Aircraft, and (ii) granted VFS the sole and exclusive right to possess the Aircraft (the "Possession Injunction").

30.     Pursuant to the Possession Injunction, on October 12, 2010, VFS took operational control of N2SA.

## PREJUDGMENT LIEN ORDER

31.     On September 28, 2010, as a result of the Corporate Guarantor's transfer or purported transfer of all of its assets to MDT Personnel, VFS filed an Order to Show Cause and Motion for Prejudgment Lien against the Debtor, the Corporate Guarantor, and the Individual Guarantors.

32.     By Order dated September 28, 2010 (the "Prejudgment Lien Order"), Judge Kapnick directed a levy upon any property which the Debtor, the Corporate Guarantor and the Individual Guarantors have any interest in the amount of not less than $18,519,694.30.

33.     The Prejudgment Lien Order prohibits and enjoins the Debtor, the Corporate Guarantor, and the Individual Guarantors from transferring or otherwise encumbering any of their assets or real property without the consent of VFS or further order of Judge Kapnick.

34.     The Prejudgment Lien Order also requires that the Debtor, the Corporate Guarantor, and the Individual Guarantors produce a detailed list of all assets and debts, including without limitation a description and the location of each asset and debt owed and owned by any of them, no later than ten (10) business days.  As such, this list of assets and debts was required to be produced no later than October 8, 2010.

## **VIOLATIONS OF THE PREJUDGMENT LIEN ORDER**

35.     The Debtor, the Corporate Guarantor, and the Individual Guarantors have all violated the Prejudgment Lien order.

36.     On October 18, 2010, VFS learned that by an Agreement purportedly dated as of October 4, 2010, Anne Mongelluzzi sold or attempted to sell/transfer her interests in an entity in which she held ownership interest.

37.     Further, although the Debtor and its counsel, Mr. Lamont, were served with, and had knowledge of, the TRO, the Possession Injunction, and the Prejudgment Lien Order, the Debtor has violated the Possession Injunction by flying N3SA, both prior to, and after, the Petition Date.

38.     When, on October 13, 2010, VFS learned of the Debtor's violations of the Possession Order, it immediately contacted the pilot for the Aircraft, Dick Joyce, and demanded immediate compliance with the TRO and Possession Order.

39.    On that same date, Mr. Lamont was also advised of the Debtor's violations of the TRO and Possession Order, as well as Anne Mongelluzzi's violations of the Prejudgment Lien Order.

40.    Through great efforts to locate and secure the safe return of N3SA, VFS learned on October 14, 2010, that the Debtor had entered into a management contract with Paradigm Jet Management ("Paradigm"), located in Michigan, and had been chartering N3SA in violation of the Security Agreements, the TRO, and the Possession Order, and that N3SA was currently located in Mexico purported on lease to "a Mexican national."

41.    Once VFS learned of the agreement with Paradigm, it contacted Jeff Spyke, President of Paradigm Jet Management, and advised him of the existence of the TRO and Possession Order.

42.    At approximately 2:40 p.m. on October 14, 2010, VFS took and exercised operational control of N3SA and made arrangements with Paradigm for its safe return to the United States.  Paradigm notified the Debtor's representative and pilot, Dick Joyce, that it was immediately suspending all FAR Part 135 operations.

43.    Several hours after VFS assumed operational control of N3SA, the Debtor, in a transparent effort to delay the sale of the Aircraft which VFS now controlled pursuant to the Possession Injunction, filed a bare bones chapter 11 petition.

44. On October 18, 2010, VFS filed an emergency motion for relief from stay with respect to the Aircraft. *See, Emergency Motion of VFS Financing, Inc. for (i) Relief from the Automatic Stay (ii) Adequate Protection of its Interests in Certain Collateral; and (iii) Other Related Relief* [Docket No. 18] (the "Stay Relief Motion").

45. On October 26, 2010, this Court entered the Temporary Order on VFS Financing Inc.'s Emergency Motion to Lift Stay (the "Stay Relief Order"), pursuant to which it required the Debtor to ground the Aircraft pending further order of the Court. *Stay Relief Order* [Docket No. 27]

## FRANK MONGELLUZZI'S BANKRUPTCY DISMISSED

46. On September 22, 2010, in response to the multiple lawsuits pending against him, Frank Mongelluzzi filed a chapter 11 petition with the United States Bankruptcy Court for the District of New Jersey, which case was pending as Case No. 10-B-39289 (the "Mongelluzzi Bankruptcy Case").

47. On October 19, 2010 – less than one month after the Mongelluzzi Bankruptcy Case was filed – the New Jersey bankruptcy court entered a *sua sponte* Order to Show Cause Why a Chapter 11 Trustee Should Not Be Appointed. *See,* Order to Show Cause Why a Chapter 11 Trustee Should Not Be Appointed, filed as Docket No. 43 in the Mongelluzzi Bankruptcy Case. At the same time, the New Jersey bankruptcy court entered an identical order in a chapter 11 case filed by ABTS Holdings, Inc., one of the many business entities owned and controlled

by Mongelluzzi. *See, Order to Show Cause Why a Chapter 11 Trustee Should Not Be Appointed*, filed as Docket No. 39 in *In re ABTS Holdings, LLC,* Case No. 10-B-39287, pending before the United States Bankruptcy Court for the District of New Jersey.

48. By Order dated October 21, 2010, the Mongelluzzi Bankruptcy Case was dismissed as a result of, *inter alia*, Frank Mongelluzzi's failure to comply with the Bankruptcy Code, and – as noted by Judge Kaplan – the fact that Frank Mongelluzzi was not following Court Orders (a reference to his multiple violations of the TRO and Possession Injunction).

49. ABTS Holdings, LLC's New Jersey bankruptcy was likewise dismissed, effective in seven days from October 21, 2010 so that prior injunctive relief entered against, *inter alia,* ABTS would at least in theory stay in effect.

## THE DEBTOR'S SCHEDULES AND STATEMENT OF FINANCIAL AFFAIRS

50. On October 29, 2010, the Debtor filed its Schedules and Statement of Financial Affairs. *See, Schedules* [Docket No. 32]; *Statement of Financial Affairs* [Docket No. 33].

51. The Debtor's Schedules identify the following as the Debtor's sole known assets: (i) two bank accounts with a $0.00 balance, (ii) an insurance policy with National Union with an undetermined value; (iii) and the Aircraft, with a combined scheduled value of $12,000,000. *See, Schedule B* [Docket No. 32]. At the same time, the Debtor's schedules identified secured claims with a total value

of $18,622,030.73, an amount well in excess of the total value of its assets. *Schedule D* [Docket No. 32].[2]

52.     Although the Debtor's Schedule F lists over 100 unsecured creditors, the Debtor has not identified any debt due and owing to *any* of those creditors. *Schedule F* [Docket No. 32}.  Indeed, the Debtor has not even listed addresses for many of the alleged unsecured creditors, making it impossible to determine whether they hold valid claims.

53.     As a result, the Debtor's List of 20 Creditors Holding the Largest Unsecured Claims [Docket No. 14] is the only concrete evidence that the Debtor has <u>any</u> unsecured creditors (other than those unsecured claims that arise from deficiency claims).  It lists unsecured claims owing to three creditors, with a total value of $32,512.53.  *See, List of 20 Creditors Holding the Largest Unsecured Claims* [Docket No. 14]

54.     The Debtor's Statement of Financial Affairs evidences that the Debtor: (i) has had no income from any business operations during the past year; and (ii) has made only a single payment to any creditor with the past ninety day, which payment was made to Premium Assignment Corporation in the amount of $3,504.98.

---

[2] Note that the calculated "total" listed on the Debtor's Schedule D has omitted the value of the Gulfstream Aerospace secured claim, and does not reflect the total value of all secured claims listed.

55.     Indeed, the Debtor's Schedules and Statement of Financial Affairs make clear that the Debtor has no employees, no executory contracts, no income, and no apparent business operations.

## ARGUMENT

**A.      Cause Exists to Dismiss the Debtor's Bankruptcy Case because it was Filed in Bad Faith.**

56.     Section 1112(b) of the Bankruptcy Code provides that "on request of a party in interest, and after notice and a hearing…the court *shall*…[convert] or dismiss a case under [chapter 11], whichever is in the best interests of the creditors…if the movant establishes cause." *11 U.S.C. § 1112(b)(1)* (emphasis added).

57.     Pursuant to 1112(b), grounds for dismissal include, but are not limited to, a finding that the debtor's bankruptcy petition was not filed in good faith. *In re Phoenix Piccadilly, Ltd.*, 849 F.2d 1393, 1394 (11th Cir. 1988).  The reasoning behind this proposition is simple – the bankruptcy code was intended to give a fresh start to the honest but unfortunate debtor.  *Marrama v. Citizens Bank of Mass.*, 549 U.S. 365, 127 S.Ct. 1105, 1116 (2007).  In contrast, it is not intended to be a vehicle for debtors to delay or frustrate the efforts of their creditors.  As such, a bankruptcy case that was not filed in good faith is subject to dismissal.  *In re State Street Houses, Inc.*, 356 F.3d 1345, 1346-1347 (11th Cir. 2004).

58.     In determining whether a petition was filed in bad faith, a court may consider any factors which evidence "an intent to abuse the judicial process and the purposes of the reorganization provisions, or, in particular, factors which evidence that the petition was filed to delay or frustrate the legitimate efforts of secured creditors to enforce their rights." *Phoenix Piccadilly, Ltd.*, 849 F.2d at 1394. Some of the factors that have been identified by the United States Appellate Court for the Eleventh Circuit to evidence a bad faith filing include: (i) whether the debtor only has one asset; (ii) whether the debtor has few unsecured creditors whose claims are small in relation to the claims of the secured creditors; (iii) whether the debtor has few employees; (iv) whether the debtor's assets are the subject of a foreclosure action as a result of arrearages on the debt; (v) whether the debtor's financial problems involve essentially a dispute between the debtor and the secured creditors which can be resolved in the pending state court action; (vi) whether the timing of the debtor's filing evidences an intent to delay or frustrate the legitimate efforts of the debtor's secured creditors to enforce their rights; (vii) whether the debtor's has a realistic possibility of an effective reorganization. *Id.*, at 1394-1395; *In re Natural Land Corp.*, 825 F.2d 296, 298 (11th Cir. 1987); *In re Boughton*, 243 B.R. 830, 834 (Bankr. M.D. Fla. 2000) (although changes in the Bankruptcy Code mean that the factors identified in *Phoenix Piccadilly* are no longer applicable to single-asset real estate debtors, they continue to apply in multiple asset cases).

59.     Once a genuine issue of good faith is presented, the debtor bears the burden of proving good faith by a preponderance of the evidence. *Id.* at 582; *In re Setzer,* 47 B.R. 340, 345 (Bankr. E.D.N.Y. 1985); *In re Yukon Enterprises*, 39 B.R. 919, 921-22 (Bankr. C.D. Cal. 1984).

60.     In the instant case, an examination of the *Phoenix Piccadilly* factors demonstrate that the chapter 11 petition was undoubtedly a bad faith filing. First, with the exception of an insurance policy with unknown realizable value, the Debtor's sole asset consists of the Aircraft – each of which are subject to first priority security interests of VFS. *See, e.g., Chapter 11 Case Management Summary* [Docket No. 22], ¶ 6(c). ("Debtor's only assets consist of the two aircraft indicated above."). Further, because the N2SA was lawfully seized by VFS prior to the Petition Date, it is not presently property of the estate. *See, e.g.*, *In re Alberto*, 271 B.R. 223, 227 (Bankr. N.D.N.Y.) (holding that personal property seized under New York law prior to the petition date was not "property of the estate" absent further action by the debtor). As such, the Debtor currently has one aircraft that constitutes property of the estate, and the Debtor has no equity in that aircraft.

61.     Second, despite the laundry list of unsecured creditors included in the Debtor's Schedule F, the Debtor's filings evidence that the Debtor has virtually no unsecured creditors other than VFS. Indeed, the Debtor's list of 20 largest unsecured creditors lists only three creditors, with a total debt of less than $35,000. *List of Creditors Holding 20 Largest Unsecured Claims* [Docket No. 5].

This number is miniscule in comparison with the more than $18,000,000 owed to VFS under the Loan Documents. *Chapter 11 Case Management Summary* [Docket No. 22], ¶ 6(b).  In this way, even were this case permitted to continue, VFS would undoubtedly be both the largest secured <u>and</u> unsecured creditor (as a result of its deficiency claim) of the Debtor.

62.     Third, the Debtor doesn't have a single employee, and its sole owner and officer is Frank Mongelluzzi – an individual whose own chapter 11 petition was just dismissed after the New Jersey bankruptcy court *sua sponte* determined that he was unable and/or unwilling to abide by the requirements of the Bankruptcy Code.

63.     Fourth, as evidenced above and in the Debtor's case management summary, the sole motivation for the Debtor's bankruptcy filing was the issuance of the TRO and the Possession Injunction by the New York state court, pursuant to which VFS was granted, among other things, a right to retake possession of the Aircraft.    *Chapter 11 Case Management Summary*, ¶ 3 ("The secured creditor…initiated efforts to repossess the aircraft, and obtained a 'grounding order' from the Supreme Court of New York County, New York.  This Chapter 11 case was then filed.").[3]  The TRO and the Possession Injunction – together with the Prejudgment Lien Order – were each entered because of the Debtor's

---

[3]  Interestingly, the case management summary seems to indicate that the bankruptcy case was filed shortly after the issuance of the TRO and the Possession Injunction.  In reality, the Debtor continued to fly the Aircraft for more than two weeks in – direct violation of the TRO and the Possession Injunction – prior to filing its bankruptcy petition.

continuing failure and refusal to abide by its obligations under the Loan Documents.

64.     Fifth, the Debtor's financial problems are predicated almost exclusively on a dispute between VFS and the Debtor.  In its case management summary, the Debtor identifies: (i) no other significant secured creditor that may have an interest in any of its assets, (ii) no other pending litigation or disputes, and (iii) minimal unsecured debt. *Chapter 11 Case Management Summary*, ¶ 3.  To the contrary, the Debtor identifies no motivating factor for filing its chapter 11 petition other than its dispute with VFS.  *Id.*  Indeed, the timing of the Debtor's bankruptcy petition occurred within hours after VFS had obtained consent from Paradigm to act in accordance with VFS's directives and to deliver the N3SA to a location of VFS's choice within the continental United States.  Even though the TRO and the Possession Injunction were entered weeks before the Petition Date – the Debtor made no attempt to modify its behavior and/or comply with those valid court orders until VFS was finally able to obtain operational control of the Aircraft.  In this way, the timing of the Debtor's bankruptcy petition, without question, evidences the Debtor's intent to delay or frustrate the legitimate efforts of VFS to enforce its rights.

65.     Finally, although the Debtor's bankruptcy case has been pending for less a month, it is already apparent that the Debtor has no business to reorganize – much less any chance of an effective reorganization.  As detailed above, the Debtor's Statement of Financial Affairs evidences that the Debtor has <u>no</u> ongoing

business operations. Indeed, the Debtor has no income, no employees, no cash, and has paid no debts other than a $3,500 claim to Premium Assignment Corporation. In addition, it has no executory contracts or other contracts that would permit it to generate income. *Schedule G* [Docket No. 32] (indicating that the Debtor will supplement the list of executory contracts as information becomes available).

66. Furthermore, even if the Debtor had a business that could be reorganized, reorganization under the instant circumstances is impossible. The Debtor's Schedules and Statement of Financial Affairs make clear that VFS will be both the largest secured and unsecured creditor (as a result of its deficiency claim) of the Debtor. As such, without VFS's cooperation, the Debtor has no realistic probability of confirming a plan of reorganization.[4] Second, because VFS has a security interest in the Aircraft, and all proceeds thereof, the Debtor's ability to use any of VFS's cash to operate its "business" is, at best, uncertain. Third, although the Debtor has not yet proposed any plan of reorganization, it is inevitable that any plan will fail to satisfy Section 1129(a)(7) of the Bankruptcy Code. Section 1129(a)(7) provides that the court shall confirm a plan *only if* "each holder of a claim or interest of such class…will receive or retain under the plan…property of a value…that is not less than the amount that such holder would so receive or retain if the debtor were liquidated under chapter 7…" *11 U.S.C.*

---

[4] This impossibility constitutes an independent basis for dismissal under *11 U.S.C. §1112(b)(4)(J).*

*§ 1129(a)(7).* Without doubt, any plan in this case would be less favorable to VFS than dismissal. Without any income to fund a plan and/or to adequately protect VFS's interest in the Aircraft – other than proceeds of the same – VFS's interests in the Aircraft are jeopardized. In this way, permitting this bankruptcy case to continue puts VFS's security position at risk, and forces VFS to shoulder all the risks of the Debtor's failed reorganization attempts.

67.    Based upon the foregoing, the Debtor's bankruptcy petition constitutes a bad faith filing and should be dismissed. *In re Canbec Inv. Corp.*, 349 B.R. 915, 918 (Bankr. M.D. Fla. 2006) (bankruptcy petition was filed in bad faith with debtor had only two assets, both of which were subject to mortgages held by a single secured creditor, and both of which were subject to foreclosure proceedings). The bankruptcy petition was filed for the sole purpose of delaying and/or impairing VFS's ability to exercise its rights with respect to the Aircraft. Further, since the Debtor had no business operations pre-petition, it is unable "reorganize" that business through a chapter 11 restructuring process.

**B.    Dismissal is Warranted Under Section 305.**

68.    Finally, dismissal of a bankruptcy proceeding is proper at "any time if…the interests of creditors and the debtor would be better served by such dismissal." *11 U.S.C. § 305(a)(1).* This case was commenced for the sole purpose of harassing VFS and delaying enforcement of its contractual and legal rights in and to the Aircraft. Since VFS is the sole creditor that will be impacted by this

bankruptcy proceeding, it is of no benefit to continue the case against VFS's wishes. Indeed, any other secured creditors' liens identified in the Debtor's schedules either have priority over VFS's security interests or they don't, and this case will not impact those determinations. Further, since there are no unencumbered assets, no known sources of income, and no business operations, no unsecured creditor is likely to receive any distribution from the Debtor's estate.

WHEREFORE, for the reasons stated herein, VFS Financing, Inc. requests that this Court enter an Order: (i) dismissing the above-captioned bankruptcy proceeding; and (ii) granting any other and further relief that may be appropriate under the circumstances.

REED SMITH LLP
Joseph J. Tuso
2500 One Liberty Place
1650 Market Street
Philadelphia, Pennsylvania 19103-7301
(215) 851-8100
(215) 851-1420 (facsimile)

and

SMITH HULSEY & BUSEY


By:    */s/ Allan E. Wulbern*
         Stephen D. Busey
         Allan E. Wulbern

Florida Bar Number 175511
225 Water Street, Suite 1800
Jacksonville, Florida 32202
(904) 359-7700
(904) 359-7708 (facsimile)
awulbern@smithhulsey.com

00729863

Attorneys for VFS Financing, Inc.